**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | | |
|---|---|---|
| MARTIN L. KENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:19-cv-1383-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| KEVIN N. HENNELLY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The following matter is before the court on defendant Kevin N. Hennelly's ("Hennelly") motion to stay and award fees, ECF No. 9, and motion to dismiss, ECF No. 18. For the reasons set forth below, the court denies the motion to stay and to award attorney's fees and grants in part and denies in part the motion to dismiss. In addition, the court orders counsel for plaintiff Martin L. Kent ("Kent") to show cause as to why the original filing of Kent's complaint does not violate Rule 11(b) within 30 days of this order.

## I.  BACKGROUND

This matter arises from an action of alleged defamation and false light invasion of privacy brought by Kent against Hennelly. The court draws these allegations from Kent's amended complaint, the operative complaint in this action. Kent is the president and CEO of The United Company, which is the parent company of Scratch Golf, LLC. Hennelly lives in Beaufort County, South Carolina. Scratch Golf owns the Hilton Head National Golf Course (the "Property") in Beaufort County, South Carolina. In July 2016, Scratch Golf submitted an application to Beaufort County to amend the rezoning of the

Property ("Rezoning Application").  On May 22, 2017, the Beaufort County Council denied the Rezoning Application.

Kent alleges that Hennelly made a post on Facebook and a comment on the website of the Island Packet, a local newspaper, that contained various defamatory statements about him, in an effort to imply that Kent is corrupt or may have committed crimes.  Kent attached images of those statements to his amended complaint, but he only references the allegedly defamatory portions in his amended complaint.  Those posts and their statements are below.

> Comment 1
> May 14, 2017 comment on the online version of a May 12 article from The Island Packet newspaper ("Island Packet Article"), ECF No. 22-1, "Hilton Head National developers: Why golf lost its swing there and what the future holds" ("Island Packet Comment")
>
> Statement:  It looks like they left out a few pertinent facts.  The most glaring is the corrupt people involved.  This guy Kent was Chief of Staff to the corrupt Governor of Virginia. He has never built a swing set never mind a 300m dollar City!!!  James Woodrow McGlothlin gave the corrupt Governor McDonald of Virginia wife a "no show" job.  The McDonalds never reported income, $36,000.  These guys . . . will break every rule in the book to get a government favor or handout.
>
> Comment 2
>
> Portion of May 23, 2017 post by Kent on his own Facebook Page, ECF No. 22-2 ("May 23 Facebook Post")
>
> Statement: The Island Packet gets an "incomplete" grade on their coverage of the issue.  For some reason they refused to print the documented corruption of the owners of the United Company.  Martin Kent and James McGlothlin were up to their eyeballs in the recent scandals in Virginia with the Governor and his wife.

As a result of these comments, Kent filed suit against Hennelly on May 10, 2019 bringing causes of action for defamation per se, defamation per quod, and false light invasion of privacy.  Kent seeks both damages and injunctive relief.

Hennelly first filed a motion to stay and award fees on June 4, 2019. ECF No. 9. Kent responded on July 5, 2019, ECF No. 19, and Hennelly replied on July 12, 2019. ECF No. 21. Then Hennelly filed a motion to dismiss on July 3, 2019. ECF No. 18. Kent filed an amended complaint on July 14, 2019, ECF No. 22, and responded to the motion to dismiss on July 16, 2019, ECF No. 23. Hennelly replied on July 22, 2019. ECF No. 24. The court held a hearing on the motions on September 30, 2019.[1] Both motions are now ripe for review.

## II. STANDARD

### A. Motion to Stay and Award Fees

Under Federal Rule of Civil Procedure 41(d), "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court: (1) may order the plaintiff to pay all or part of the costs of that previous action; and (2) may stay the proceedings until the plaintiff has complied."

### B. Motion to Dismiss

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability

---

[1] The court would like to acknowledge Aaron Chou, a third-year law student at Duke University School of Law, who skillfully argued this motion on behalf of Hennelly. The court wishes him well as he concludes his study of law and embarks upon what promises to be a successful career.

of defenses."). To be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support his claim and would entitle him to relief. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a Rule 12(b)(6) motion, the court should accept all well-pleaded allegations as true and should view the complaint in a light most favorable to the plaintiff. Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir.1999); Mylan Labs., Inc., 7 F.3d at 1134. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### III. DISCUSSION

#### A. Motion to Stay and Award Fees

In Hennelly's motion to stay, he argues that, pursuant to Rule 41(d) of the Federal Rules of Civil Procedure, the court should award Hennelly $9,052 in attorney's fees and stay this action until Kent pays the fees. Hennelly argues this is warranted based on the history of the cases in which Hennelly has been sued by Kent and James McGlothlin ("McGlothlin"), who has made similar allegations regarding Hennelly's online posts in another case before this court, McGlothlin v. Hennelly, No. 18-cv-246 ("McGlothlin case"). Important to Hennelly's argument is the fact that Kent and McGlothlin are

represented by the same attorney. The history of the litigation is as follows. First, McGlothlin sued Hennelly in federal court in the Middle District of Florida. As such, Hennelly had to hire Florida counsel. That case was dismissed for lack of personal jurisdiction, but the court gave McGlothlin two weeks to amend his complaint to sufficiently allege the facts necessary for the court to establish personal jurisdiction over Hennelly. Instead, McGlothlin voluntarily dismissed the Florida action and refiled it in this court, where personal jurisdiction over Hennelly exists. As mentioned above, that action is currently pending before this court.

Kent first brought suit against Hennelly in federal court in the Eastern District of Tennessee. Hennelly had to retain counsel in Tennessee, and like the Florida action, the Tennessee action was dismissed for lack of personal jurisdiction over Hennelly. However, instead of immediately re-filing in South Carolina like McGlothlin did, Kent instead appealed the district court's order on personal jurisdiction to the Sixth Circuit Court of Appeals. Throughout the appeal, Hennelly's counsel suggested that Kent dismiss the appeal and re-file in South Carolina, but Kent's counsel did not do so. As such, Hennelly briefed the issues on appeal, participated in mediation in good faith, and prepared for oral argument that was scheduled for March 21, 2019. Then on March 15, 2019, Kent's counsel sent Hennelly's counsel an email indicating that Kent wanted to dismiss the appeal. Hennelly's counsel objected due to the time and resources that they had already spent on the appeal, but Kent filed a motion to voluntarily dismiss the appeal, and the Sixth Circuit granted it. On May 10, 2019, Kent filed this action. Kent included allegations in his original complaint that had already been found by this court to be unactionable in the McGlothlin case.

Hennelly argues that this behavior warrants an award of attorney's fees for the litigation of the Tennessee case pursuant to Rule 41(d). Under Rule 41(d), a defendant may obtain attorney's fees from a plaintiff "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant." The Fourth Circuit has established that when a statute does not provide for attorney's fees, "a district court may award attorneys' fees when the opposing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Andrews v. America's Living Ctrs., LLC, 827 F.3d 306, 311 (4th Cir. 2016) (internal quotes omitted). The Fourth Circuit relies on the Black's Law definition of vexatious, which is "without reasonable or probable cause or excuse." Id. (citing Vexatious, Black's Law Dictionary (7th ed. 1999)). There is generally no vexation when there has been no discovery, no substantial motion practice, and dismissal occurs shortly after the case had been filed. Id. at 313. Most courts that have found vexatious behavior have done so when a plaintiff voluntarily dismisses his case in one court and then refiles a virtually identical complaint in another court. See Robinson v. Bank of Am., N.A., 553 F. App'x 648, 652 (8th Cir. 2014) (holding that the district court did not abuse its discretion by awarding attorney's fees when the plaintiff dismissed his case in federal court and brought the same action in state court); Kent v. Bank of Am., N.A., 518 F. App'x 514, 517 (8th Cir. 2013) (holding that attorney's fees award under Rule 41(d) was appropriate because the plaintiff dismissed his case and immediately refiled it with only "incidental" changes to the complaint).

Hennelly acknowledges that the court denied a similar Rule 41(d) motion in the McGlothlin case. In its order in the McGlothlin case, the court explained that McGlothlin

had a reasonable basis to bring suit in Florida based on his personal jurisdiction arguments about Hennelly's posts being on the internet, and while a Florida court ultimately found him to be incorrect, McGlothlin's actions did not amount to bad faith. Hennelly argues that a different result here is warranted because of (1) the additional fact of Kent appealed the Tennessee district court's order and then subsequently dismissed his Sixth Circuit appeal and (2) Kent's filing of a complaint with allegations that had already been dismissed by this court in the McGlothlin case. Hennelly contends that these two facts show that Hennelly has acted vexatiously and in bad faith.

In response, Kent argues that attorney's fees are not warranted here. With regard to Kent's dismissal of his Sixth Circuit appeal, Kent explains that he dismissed the appeal because the South Carolina statute of limitations was about to expire. As to Kent's inclusion of allegations that were dismissed in the McGlothlin case, Kent argues that he initially included them because Kent and McGlothlin "are two different individuals with multiple different life experiences, sensibilities, and claims." ECF No. 19 at 1 n.3. However, Kent later amended his complaint to remove the allegations that were dismissed by the court in the McGlothlin case.

Beginning with the dismissal of the Sixth Circuit appeal, the South Carolina statute of limitations was close to expiring when Kent dismissed his appeal. In South Carolina, "[t]he limitations period [for a defamation claim] begins when the alleged defamatory statement is made," Harris v. Tietex Int'l Ltd., 790 S.E.2d 411, 416 (S.C. Ct. App. 2016), and South Carolina defamation has a statute of limitations of two years, S.C. Code Ann. § 15-3-550. The allegedly defamatory statements were made in May 2017, and Kent's action in this court was filed about two years later in May 2019.

The court is skeptical of Kent's statute of limitations explanation. Let's assume that Kent's counsel's plan was to appeal to the Sixth Circuit and then refile in South Carolina if he lost the appeal. Kent's counsel presumably knew that he had to file suit in South Carolina by May 2019. The Sixth Circuit appeal was filed on August 7, 2018. The court finds it hard to believe that Kent's counsel believed that the appeal would be decided in less than a year. The Sixth Circuit briefing was completed on December 12, 2018, and on January 23, 2019, oral argument was scheduled for March 21, 2019. Therefore, Kent's counsel knew as early as January 2019 that oral argument was schedule for a little over a month from the date on which the statute of limitation tolled. This timing makes it seem unlikely that Kent's counsel dismissed the appeal because the statute of limitations was about to expire, as Kent's counsel would have known about the timing limitations imposed by the statute of limitations much earlier than the eve of oral argument.

However, the court is constrained to deny relief under Rule 41(d) for this questionable conduct. While the procedural history here is different from the procedural history in the McGlothlin litigation due to the additional work that was done during Kent's appeal, the case was still in early stages. The appeal focused only on the issue of personal jurisdiction, and no discovery had been conducted. Moreover, all of the cases cited by Hennelly and revealed by the court's own research address the situation in which a plaintiff dismisses a case in district court and refiles it in district court. Applying Rule 41(d) here to Kent's dismissal of an appeal and refiling in a district court in another jurisdiction would require the court to extend the reach of Rule 41(d) beyond what appears to be its current confines. While the court is sympathetic to Hennelly's

frustration with Kent's attorneys' tactics, it declines to award attorney's fees under Rule 41(d) for Kent's dismissal of the Sixth Circuit appeal and refiling of the case in this court.

Turning to Hennelly's arguments regarding Kent's original complaint, Kent argues that he was justified in filing his complaint that contained allegations that the court dismissed in the McGlothlin case because of the personal differences between Kent and McGlothlin. This may be more convincing if the defamation allegations dismissed by the court in the McGlothlin case were unique to McGlothlin, but they weren't. A review of the court's order in the McGlothlin case is useful here. There were 3 posts made by Hennelly at issue in that order—a May 12, 2017 Facebook post, a May 14, 2017 comment on The Island Packet article, and a May 23, 2017 Facebook post. The May 12, 2017 post consisted of Hennelly reposting a Washington Post article with the commentary "A little something the Island Packet overlooked." ECF No. 38 at 2, No. 18-cv-246. The court found that McGlothlin could not base his defamation claim on this article because "Hennelly could not be held liable for reposting an article that was not even published by him but by a newspaper." Id. at 8. This finding is not unique to McGlothlin, as the post did not mention McGlothlin by name, yet for some unknown reason, Kent included the same allegation in his original complaint. Compl. ¶ 14.

The court next considered together the May 14, 2017 comment on The Island Packet article and the May 23, 2017 Facebook post. Within those statements, the court found that "Hennelly's statements that McGlothlin is a 'crony capitalist,' a 'crook,' and a 'crooked owner' are all rhetorical hyperbole" and therefore McGlothlin could not base his defamation claims on them. ECF No. 38 at 18, No. 18-cv-246. Again, this finding is not unique to McGlothlin, as Hennelly called both McGlothin and Kent those names, and

Kent still included the same allegations in his original complaint. Compl. ¶¶ 15–16. The same attorney represents McGlothlin and Kent; therefore, it is crystal clear that Kent's attorney knew of this court's ruling in the McGlothlin case when he filed this action.

If Kent had filed his complaint prior to the court's order, the inclusion of these allegations could be understandable. However, the court filed its order on March 1, 2019, and Kent filed his complaint on May 10, 2019. Kent tries to further justify his inclusion of these allegations by placing blame on Hennelly's counsel's failure to consult with Kent's counsel prior to filing the Rule 41(d) motion. Kent's counsel explained at the hearing on the motions that if Hennelly's counsel had consulted with him prior to filing the Rule 41(d) motion, he would have amended the complaint and obviated the need for the motion.

This blame is misplaced. On May 1, 2019, Kent filed a complaint with claims that his counsel obviously knew this court had already found to be untenable. He did not offer to amend his complaint to remove the untenable claims until he contacted Hennelly's counsel on July 3, 2019. Regardless of whether Hennelly's counsel should have consulted with Kent's counsel prior to filing the instant motion, the fact remains that Kent initially filed a complaint with claims that this court had already found to be unsupported by the law.

Again, the court is constrained to find that Rule 41(d) provides no relief for this conduct. For Rule 41(d) to apply here, it would mean that Kent would have filed the same claims in South Carolina that had been dismissed in Tennessee. However, Hennelly bases this argument on McGlothlin's case, not Kent's Tennessee case. In other words, if the court's order in the McGlothlin case had been issued by the court in

Tennessee in Kent's first case, then there could be grounds for relief under Rule 41(d). Indeed, the purpose of Rule 41(d) relief would be for Hennelly to recover his attorney's fees spent in Tennessee. The fact that Kent filed claims that had already been dismissed by this court would not justify paying Hennelly's Tennessee attorney's fees because his Tennessee attorney is not involved in the cases before this court. Therefore, Kent's filing of already-dismissed claims from the McGlothlin case does not give rise to relief under Rule 41(d).

Nevertheless, this conduct may give rise to sanctions under Rule 11 of the Federal Rules of Civil Procedure. Pursuant to Rule 11, when an attorney presents a pleading to the court, he "certifies that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that "the claims . . . are warranted by existing law." Fed. R. Civ. P. 11(b)(2). Based on the information before the court, it appears that Kent filed claims that were not warranted under existing law because this court had previously found those exact claims to be untenable. Again, the fact that Kent subsequently amended his complaint does not change the fact that he first filed his original complaint with these claims. "On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3). As such, the court orders Kent to show cause as to why the original filing of his complaint does not violate Rule 11(b) within 30 days of this order.

### B. Motion to Dismiss

As discussed above, Hennelly originally filed a motion to dismiss Kent's original complaint. Because Kent filed an amended complaint with his response to the motion to

dismiss, Hennelly's reply contains narrowed arguments as to why the amended complaint should be dismissed, with reference to arguments Hennelly made in his motion to dismiss. First, Hennelly references his argument in his motion to dismiss that Kent is a public figure or limited-purpose public figure, and that Kent has failed to rebut that argument. Next, Hennelly argues that none of his statements quoted in the amended complaint can serve as a basis for a defamation claim because they are all hyperbolic. Hennelly also argues that Kent has not adequately pleaded common law malice and Kent's defamation per quod claims fail to sufficiently plead special damages. Finally, Hennelly contends that South Carolina does not recognize a cause of action for false light invasion of privacy.

### a. Defamation

To bring a successful claim for defamation under South Carolina law, a plaintiff must prove: "(1) a false and defamatory statement was made; (2) the unprivileged publication of the statement was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement regardless of special harm or the publication of the statement caused special harm." Kunst v. Loree, 817 S.E.2d 295, 302 (S.C. Ct. App. 2018), reh'g denied (Aug. 16, 2018).

"In any alleged case of defamation, '[i]t is the trial court's function to determine initially whether a statement is susceptible of having a defamatory meaning.'" Lane v. Hilton Worldwide, Inc., 2012 WL 1191648, at *3 (D.S.C. Feb. 28, 2012), report and recommendation adopted, 2012 WL 1192065 (D.S.C. Apr. 10, 2012) (quoting Pierce v. Northwestern Mut. Life Ins. Co., 444 F.Supp. 1098, 1101 (D.S.C. 1978)). "The Court will not hunt for a forced and strained construction to put on ordinary words, but will

construe them fairly, according to their natural and reasonable import, in the plain and popular sense in which the average reader naturally understands them. There is no presumption of defamation." Timmons v. News & Press, Inc., 103 S.E.2d 277, 280–81 (S.C. 1958).

"The publication of a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Fleming v. Rose, 567 S.E.2d 857, 860 (S.C. 2002). Defamatory statements are either defamatory per se or defamatory per quod. Parrish, 656 S.E.2d at 388. A statement is defamatory per se if its defamatory meaning is clear from the statement standing alone; if the reader of the statement must know additional facts or circumstances outside of the statement in order to understand its defamatory nature, then the statement is defamatory per quod. Id. "In cases involving defamation per quod, the plaintiff must introduce facts extrinsic to the statement itself in order to prove a defamatory meaning." Holtzscheiter v. Thomson Newspapers, Inc, 506 S.E.2d 497, 509 (S.C. 1998). "If the question is one on which reasonable minds might differ, then it is for the jury to determine which of the two permissible views they will take." Id. However, the court may consider evidence of "extrinsic facts and circumstances" in determining whether to submit the issue to the jury.[2] Id.

As to the fourth element, South Carolina courts have found that "[e]ssentially, all libel is actionable per se." Erickson v. Jones St. Publishers, LLC, 629 S.E.2d 653, 664 (S.C. 2006); see also Holtzscheiter v. Thomson Newspapers, Inc, 506 S.E.2d 497, 502

---

[2] Of course, here the court may only consider facts alleged in the complaint and the documents attached to the complaint or incorporated by reference in the complaint.

(S.C. 1998) ("Libel is actionable <u>per se</u> if it involves written or printed words which tend

to . . . reduce his character or reputation in the estimation of his friends or acquaintances,

or the public . . . ."). When a statement is actionable per se, the defendant is presumed to

have acted with common law malice, and the plaintiff is presumed to have suffered

general damages. <u>Erickson</u>, 629 S.E.2d at 664. "Whether the statement is actionable <u>per</u>

<u>se</u> is a matter of law for the court to resolve." <u>Fountain</u>, 70 S.E.2d at 309.

In addition, a common law defamation claim must also comport with the First

Amendment. See <u>Snyder v. Phelps</u>, 580 F.3d 206, 217 (4th Cir. 2009) ("It is well

established that tort liability under state law, even in the context of litigation between

private parties, is circumscribed by the First Amendment."). The First Amendment

imposes limitations based on the subject of the alleged defamation as well as the type of

speech at issue. <u>Id.</u> As to the first limitation, public officials and public figures may only

recover damages for defamation when the allegedly defamatory statement was made with

actual malice. <u>Id.</u> at 218. With regard to the type of speech, statements that "cannot

'reasonably [be] interpreted as stating actual facts' about an individual" are protected by

the First Amendment. <u>Id.</u> (quoting <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 21

(1990)).

Hennelly's arguments as to why Kent's defamation claims must be dismissed are

based on both South Carolina common law and the First Amendment. The court will first

address the First Amendment issues—actual malice and rhetoric hyperbole—and then

turns to Hennelly's common law arguments.

### i. Public Figure and Actual Malice

Hennelly first argues that Kent is a public figure or limited-purpose public figure, and as such, he must allege actual malice, which he failed to do. In response, Kent contends that he is not a limited-purpose public figure, and that even though it was not necessary for him to do so, he properly alleged actual malice. Hennelly replies by arguing that Kent's conclusory response, with no citation to case law, entitles the court to treat his response as a concession that he is a public figure or limited-purpose public figure.

Even assuming Kent is a public figure or limited-purpose public figure, Hennelly's argument is not grounds for dismissal because Kent has sufficiently pleaded malice. In order for a public figure or limited-purpose public figure to succeed in a defamation claim, he must prove that the statement was made with actual malice. New York Times Co. v. Sullivan, 376 U.S. 254, 279 (1964). A conclusory allegation of actual malice or a mere recitation of the legal standard is insufficient to adequately plead actual malice. Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 378 (4th Cir. 2012). Hennelly argues that Kent has failed to plead actual malice because the amended complaint contains no factual allegations to support the inference that Hennelly knew his statements were false or made with reckless disregard for the truth. However, Kent alleges that Hennelly "conducted extensive research regarding Kent—research that revealed (or would have revealed) that Kent has never officially been accused—let alone convicted—of any crime (including public, or any other type of corruption)" and that "even with this knowledge, [Hennelly] still made the false and defamatory statements that are set forth in Paragraphs 14 and 15." Am. Compl. ¶ 16 (emphasis in original). In

considering the instant motion, the court must accept the complaint's factual allegations as true. Therefore, Kent has sufficiently pleaded malice if the court finds him to be a public figure or limited-purpose public figure. As such, the court need not determine at this stage in litigation whether Kent is a public figure, and Hennelly's argument does not provide grounds for dismissal.

### ii. Rhetorical Hyperbole

Hennelly next contends that the only remaining allegedly defamatory statements related to Kent in the amended complaint are hyperbolic and rhetoric and therefore cannot serve as a basis for Kent's defamation claims. The first allegedly defamatory statement is:

> It looks like they left out a few pertinent facts. The most glaring is the corrupt people involved. This guy Kent was Chief of Staff to the corrupt Governor of Virginia. he [sic] never built a swing set never mind a 300m dollar city!!! James Woodrow McGlothlin gave the corrupt Governor McDonald [sic] of Virginia wife a "no show" job. The McDonald's [sic] never reported income, $36,000. These guys . . . will break every rule in the book to get a government favor or handout.

Am. Compl. ¶ 14. The only statements related to Kent are "[t]he most glaring is the corrupt people involved"; "[t]his guy Kent was Chief of Staff to the corrupt Governor of Virginia. he [sic] has never built a swing set never mind a 300m dollar city!!!"; and "[t]hese guys . . . will break every rule in the book to get a government favor or handout." The second allegedly defamatory statement is:

> The Island Packet gets an "incomplete" grade on their coverage of the issue. For some reason they refused to print the documented corruption of the owners of the United Company. Martin Kent and James McGlothlin were up to their eyeballs in the recent scandals in Virginia with the Governor and his wife.

Am. Compl. ¶ 15. The statements related to Kent are that the Island Packet "refused to print the documented corruption of the owners of the United Company"; and "Martin

Kent and James McGlothlin were up to their eyeballs in the recent scandals in Virginia with the Governor and his wife."

Hennelly argues that it is factually true that Kent was the Chief of Staff to Governor McDonnell, and that "he [sic] has never built a swing set never mind a 300m dollar city!!!" and "Martin Kent and James McGlothlin were up to their eyeballs in the recent scandals in Virginia with the Governor and his wife" are rhetorical hyperbole that is not actionable. The court agrees.

"[S]tatements that cannot reasonably be interpreted as stating actual facts about an individual" receive greater protection from defamation claims. <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 20 (1990). In <u>Milkovich</u>, the Supreme Court made clear that <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323 (1974), was not "intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.'" <u>Id.</u> at 18. However, the Court explained that it wished to provide "assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." <u>Id.</u> at 20.

In determining whether a statement could be interpreted as stating actual facts, or whether the statement is rhetorical hyperbole, courts both "assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message" and "emphasize the verifiability of the statement, because a statement not subject to objective verification is not likely to assert actual facts." <u>Snyder</u>, 580 F.3d at 219 (internal quotations omitted). As the Fourth Circuit reiterated, "[t]he general tenor of rhetorical speech, as well as the use of 'loose, figurative, or hyperbolic language' sufficiently

negates any impression that the speaker is asserting actual facts."  Id. at 220 (citing

Milkovich, 497 U.S. at 21); see also CACI Premier Tech., Inc. v. Rhodes, 536 F.3d 280,

300 (4th Cir. 2008) (finding that defendant's statements that plaintiffs were

"mercenaries" and "killers" and that those involved could "do any damn thing you want

to, including torture people" was a clear use of hyperbole and exaggeration, and were

thus not actionable); Agora, Inc. v. Axxess, Inc., 90 F. Supp. 2d 697, 702 (D. Md. 2000),

aff'd, 11 F. App'x 99 (4th Cir. 2001) (finding that statements that the plaintiff does not

engage in "real" reporting, but rather conducts only "pseudo research" and "mere

puffery" was not capable of a defamatory meaning because they "cannot reasonably be

interpreted as stating actual fact").  Courts must assess "as a matter of law whether

speech contains rhetorical hyperbole protected by the First Amendment."  Snyder, 580

F.3d at 220.

Beginning with the first statement, "This guy Kent was Chief of Staff to the

corrupt Governor of Virginia.  he [sic] has never built a swing set never mind a 300m

dollar city!!!", the assertion that Kent was Chief of Staff to the Governor of Virginia is a

fact.  Whether Kent "has never built a swing set never mind a 300m dollar city" is clearly

hyperbolic.  Not only would it be unreasonable to interpret this as stating an actual fact,

but in order to prove the truth of it, Hennelly would have to show that Kent has never

built a swing set or a $300 million city.  Because the statement is hyperbolic, Kent cannot

base a defamation claim on it.

As for the second statement, "Martin Kent and James McGlothlin were up to their

eyeballs in the recent scandals in Virginia with the Governor and his wife", this statement

is equally hyperbolic.  This figurative language negates any impression that Hennelly is

18

asserting an actual fact. Moreover, to prove the truth of this statement, Hennelly would have to show how far up Kent's body his involvement went, which is clearly not possible. As such, the court finds this statement to be hyperbolic rhetoric that is not actionable.

Although unaddressed by the parties, the court also finds "[t]hese guys . . . will break every rule in the book to get a government favor or handout" to be rhetorical hyperbole. Again, "breaking every rule in a book" is figurative speech that does not assert an actual fact. To prove the truth of this statement, Hennelly would have to show that Kent would break every unidentified rule in a hypothetical book to get a government favor or handout. Therefore, this statement is also inactionable rhetorical hyperbole.

Therefore, Kent is left with statements that allege corruption, including "[t]he most glaring is the corrupt people involved" and that Kent, as an owner of the United Company, engaged in documented corruption. Hennelly argues that these statements are also rhetorical hyperbole. However, in doing so, Hennelly cites to cases that consider whether, under South Carolina law, a statement has defamatory meaning. ECF No. 18 at 11. For example, in Goodwin v. Kennedy, the Court of Appeals of South Carolina considered whether a statement was defamatory and therefore actionable per se. 552 S.E.2d 319, 324 (S.C. Ct. App. 2001). Similarly, in Wise v. INVISTA s.a.r.l., the court determined that the plaintiff failed to sufficiently allege the elements of a defamation claim under South Carolina law. 2018 WL 525475, at *4 (D.S.C. Jan. 23, 2018). As such, the court will consider whether these remaining statements are rhetorical hyperbole, which is protected by the First Amendment, and whether the statements are defamatory under South Carolina law.

The court first considers whether the remaining statements about corruption are rhetorical hyperbole. The Supreme Court considered a somewhat similar case in which a local newspaper reported on city council meetings in which there was heated debate about zoning issues. Greenbelt Co-op. Pub. Ass'n. v. Bresler, 398 U.S. 6, 7 (1970). The zoning issues stemmed from the respondent's, Bresler, zoning negotiations with the city council. The local newspaper reported on the contentious city council meetings and stated that some people had characterized Bresler's negotiation position as blackmail. As such, Bresler sued the newspaper for libel.

The court held that it was constitutionally impermissible to attach libel liability to the newspaper's use of the term "blackmail" in this context. The court explained that, when viewing the term in context, "[n]o reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense." Id. at 14. This was because the newspaper was clearly reporting on these debates, the reporting was accurate and full, and importantly, the fact that some people had referred to Bresler's proposal as blackmail was an accurate statement. The court concluded that the term "blackmail" was inactionable hyperbole because "even the most careless reader must have perceived that the word [blackmail] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." Id.

Greenbelt is distinguishable from the instant case. Here, Hennelly was not merely reporting on comments made by others that characterized Kent as corrupt. Read in context, Hennelly himself has asserted that Kent was corrupt by stating that Kent is one of the "corrupt people involved" in the zoning issue and that Kent engaged in

"documented corruption." Moreover, unlike in <u>Greenbelt</u>, where no reader could think

that Bresler had committed the criminal offense of blackmail, a reader here could think

that Kent did participate in documented corruption. Indeed, read in context, a reader

could believe that Hennelly was asserting the actual fact that Kent engaged in

documented corruption, meaning that the statements are not rhetorical hyperbole. Other

rhetorical hyperbole cases upon which Hennelly relies apply the law of states other than

South Carolina, making them inapplicable to the instant action. <u>See</u> <u>Field v. Grant</u>, 920

N.Y.S.2d 240 (Sup. Ct. 2010) (applying New York state law); <u>Okun v. Superior Court</u>,

29 Cal. 3d 442, 459 (1981) (applying California state law). As such, the court finds that

Hennelly's statements regarding corruption are not rhetorical hyperbole.

 The court next addresses whether these statements about corruption are

defamatory and therefore actionable pursuant to South Carolina law. Hennelly first

argues that the general implication of corruption is not actionable because it carries "no

plain meaning" that Kent engaged in discrete acts of verifiable corruption. The court is

unconvinced by this argument. The case law on which Hennelly relies stands for the

proposition that "[d]efamation need not be accomplished in a direct manner" and that "[a]

mere insinuation is actionable as a positive assertion if it is false and malicious and its

meaning is plain." <u>Eubanks v. Smith</u>, 354 S.E.2d 898, 901 (S.C. 1987). In other words, a

statement may still be defamatory even if it simply insinuates something defamatory as

long as the insinuation's meaning is plain and the insinuation is false and malicious.

However, this proposition does not apply here because the statements do not merely

insinuate that Kent was involved in corruption—they explicitly call Kent corrupt and

allege that he was engaged in documented corruption. As such, the court need not question whether any insinuation has plain meaning.

Hennelly also argues that in context, it is clear that a reasonable reader would think that Hennelly was expressing his opinion about the Island Packet article's shortcomings as opposed to making factual assertions about Kent engaging in corruption. As such, he contends that the statements are not defamatory per se. However, in order to explain the Island Packet article's shortcomings, Hennelly affirmatively states that Kent is corrupt and has engaged in documented corruption. Therefore, Hennelly's comments serve dual roles—that the Island Packet article overlooked certain facts, and that one of those facts is that Kent is corrupt. As such, this argument fails to convince the court that Hennelly's statements are not defamatory.

Hennelly acknowledges that the court did not dismiss Hennelly's statement about "documented corruption" in the McGlothlin case but that the court did not do so because it considered the statement in conjunction with the statement that McGlothlin gave the Governor of Virginia's wife a "no show" job. However, Hennelly distinguishes this case by arguing that, unlike in the McGlothlin case, there is no corresponding fact-oriented statement that could be considered in conjunction with Hennelly's accusation of documented corruption. However, Hennelly cites to no law that requires a defamation claim to include both a defamatory statement and corresponding facts to be considered along with the defamatory statement.

In sum, the court finds that the statements that "This guy Kent was Chief of Staff to the corrupt Governor of Virginia. he [sic] has never built a swing set never mind a 300m dollar city!!!"; "Martin Kent and James McGlothlin were up to their eyeballs in the

recent scandals in Virginia with the Governor and his wife"; and ""[t]hese guys . . . will break every rule in the book to get a government favor or handout" are rhetorical hyperbole, meaning Kent cannot base his defamation claims on them. The remaining statements regarding corruption do not qualify as rhetorical hyperbole and are actionable defamation; therefore, they survive the motion to dismiss.

### iii.   Common Law Malice

Hennelly also argues that Kent has not adequately pleaded common law malice. However, Kent need not plead common law malice because under South Carolina law, common law malice is presumed in libel actions. As discussed above, "[e]ssentially, all libel is actionable per se." Erickson, 629 S.E.2d at 664. When a statement is actionable per se, the defendant is presumed to have acted with common law malice, and the plaintiff is presumed to have suffered general damages. Id. Therefore, Kent's failure to plead common law malice is not fatal to his defamation claims.

### iv.   Special Damages for Defamation Per Quod

Next, Hennelly argues that Kent's defamation per quod claim must be dismissed because Kent has failed to sufficiently plead special damages. However, in making this argument, Hennelly convolutes two separate concepts under South Carolina law: whether a statement is defamatory and whether a statement is actionable, which determines damages.

As discussed above, defamation per se exists when a statement is defamatory on its face, while defamation per quod occurs when "the defamatory meaning is not clear unless the hearer knows facts or circumstances not contained in the statement itself." Holtzscheiter v. Thomson Newspapers, Inc., 506 S.E.2d 497, 501 (S.C. 1998). "In cases

involving defamation per quod, the plaintiff must introduce facts extrinsic to the statement itself in order to prove a defamatory meaning." Id. However, the type of defamation at issue does not mandate the type of damages at issue. Instead, the type of damages is determined by the actionability of the statement. "A separate issue is whether the statement is 'actionable per se' or not." Id. If defamation is actionable per se, then the law presumes that the defendant acted with common law malice and that the plaintiff suffered general damages. Id. "If a defamation is not actionable per se, then at common law the plaintiff must plead and prove common law actual malice and special damages." Id. at 501–02.

Therefore, defamation per quod does not necessarily require special damages. Instead, the question of whether defamation is actionable per se determines whether a plaintiff must plead and prove special damages. In South Carolina, "[e]ssentially[ ] all libel is actionable per se." Id. Therefore, the law presumes malice and general damages, and Kent need not plead special damages.

**b. False Light Invasion of Privacy**

Hennelly argues that false light invasion of privacy is not a cause of action in South Carolina and as such, this claim must be dismissed. Kent concedes that this cause of action does not exist under South Carolina law but argues that the court should nevertheless create such a cause of action here.

"No South Carolina court has recognized a cause of action for false light invasion of privacy." BidZirk, LLC v. Smith, 2007 WL 3119445, at *4 (D.S.C. Oct. 22, 2007). In attempting to convince the court to create a cause of action for false light, Kent simply argues that "[c]onsidering the potential harm and damage that portraying someone in a

false light can and does cause," the court should adopt the cause of action. This is an unconvincing policy argument for the court to create a new cause of action under South Carolina law. As such, the court dismisses the false light invasion of privacy cause of action.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** the motion to stay and to award attorney's fees and **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss. In addition, the court orders Kent to show cause as to why the original filing of his complaint does not violate Rule 11(b) within 30 days of this order.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**November 12, 2019**
**Charleston, South Carolina**